## Stevens et al., Appellants, v. Delaware, Lackawanna & Western R. R. Co.

*Equity—Laches—Title to coal lands—Limited partnership—Dissolution—Distribution of assets—Assertion of title by partner—Act of June 2, 1874, P. L. 271—Tenants in common—Ouster—Accounting—Lapse of time—Knowledge—Inquiry.*

1. Where the members of a limited partnership operating coal lands execute a deed of all their lands to one of the partners, and convert the other assets into cash which they distribute among themselves, and cease all operations, the partnership is dissolved as far as the members themselves are concerned, although no publication was made and the requirements of the Act of June 2, 1874, P. L. 271, as to dissolution, were not strictly complied with.

2. In such case, a deed of a partner, conveying all the underlying coal, owned by a former partnership to a mining company, is a distinct and unequivocal act of ouster, asserting a right of ownership hostile to any partner claiming an interest.

3. The acts of the coal company in operating and mining the coal, were unequivocal and notorious acts of ouster of such hostile character as to put a partner, claiming to be a cotenant of the company, on inquiry.

4. Declarations of one of the other partners against interest are evidence of the existence of such hostile acts.

5. No inflexible rule can be prescribed as to the lapse of what period shall disentitle a suitor to an account. The court may refuse a decree even when an action is not barred by the statute.

6. The question of laches does not depend as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, plaintiff is chargeable with want of due diligence in failing to institute or prosecute his proceeding.

7. A decree for an account should be denied in any case where it clearly appears that the party asking it has, by his laches, rendered it impossible for the court to do full justice to both parties, whether the infirmity of the case consists in the death of a party, loss of evidence, or other cause.

8. Where a person charged with laches in failing to assert his rights against a fraud, sets up a defense of want of knowledge of the fraud, he must show not only that he was ignorant of the fraud, but that he had used reasonable diligence to inform himself of the facts.

Argued May 16, 1923. Appeal, No. 2, Jan. T., 1923, by plaintiffs, from decree of C. P. Lackawanna Co., Oct. T., 1918, No. 1, dismissing bill in equity, in case of Fred E. Stevens, and Fred E. Stevens surviving executor of A. B. Stevens, deceased, *v.* Delaware, Lackawanna & Western Railroad Co.; Peoples Coal Co. et al. and the Scranton Trust Co., executors and trustees of Everett Warren, deceased. Before WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Bill in equity for discovery and accounting of mesne profits. Before NEWCOMB, J.

The opinion of the Supreme Court states the facts.

Bill dismissed. Plaintiffs appealed.

*Error assigned,* inter alia, was decree, quoting it.

*H. M. Streeter* and *H. C. Reynolds,* for appellants.— The owner of the minerals does not lose his right or his possession by any length of nonuser: Armstrong v. Caldwell, 53 Pa. 284.

On dissolution of the association the land reverted to its natural character, and the partners held as tenants

in common: Pontius v. Walls, 197 Pa. 223; Foster's App., 74 Pa. 391.

Where land is partnership stock, it never becomes personalty, even during the continuance of the firm, so as to give one partner power to dispose of the firm's interest in it: Foster's App., 74 Pa. 391.

As purchaser of the share of a tenant in common the D., L. & W. R. R. Co. became tenant in common with the remaining owners: Smith v. Myers, 12 Luz. Leg. Reg. 188; McGowan v. Bailey, 179 Pa. 470; M'Masters v. Bell, 2 P. & W. 180; Harding v. Seeley, 148 Pa. 20; Wells v. Becker, 24 Pa. Superior Ct. 174; Cannon v. Jackson, 252 Pa. 257.

No right of action for an accounting against the D., L. & W. R. R. Co., for mining on the Bridge Lot could exist until after mining and liability to account began: McGowan v. Bailey, 179 Pa. 470, 480.

Mere declarations or claims will not amount to a disseisin of a cotenant: Hall v. Mathias, 4 W. & S. 331; Forward v. Deetz, 32 Pa. 69; Filbert v. Hoff, 42 Pa. 97; Bannon v. Brandon, 34 Pa. 463; Wells v. Becker, 24 Pa. Superior Ct. 174, 177; Bennet v. Bullock, 35 Pa. 364; Norris v. Gould, 15 W. N. C. 187; Smith v. Myers, 12 Luz. Leg. Reg. 183.

An ouster of one tenant in common by another is not to be presumed, but must be evidenced by some unequivocal act or acts irreconcilable with joint tenancy: White v. Williams, 2 Grant 249; Hart v. Gregg, 10 W. 185; Watson v. Gregg, 10 W. 289.

The statute begins to run only from the date of ouster, and the burden is on defendants to establish that initial point: Johns v. Johns, 244 Pa. 48; O'Boyle v. Kelly, 249 Pa. 13.

This possession and mining were covert and clandestine, and the statute does not begin to run from the dates of mining, but from the time of discovery: Lewey v. Coke Co., 166 Pa. 536; D. & H. C. Co. v. Hughes, 183 Pa. 66, 70.

Full knowledge of all the facts concurring with a delay for unreasonable length of time are the essential elements of the defense of laches, and laches does not begin to run until knowledge is known to exist.

*J. H. Oliver,* with him *Reese H. Harris* and *Edward W. Warren,* of *Knapp, O'Malley, Hill & Harris,* for appellee. —The appellant was guilty of gross laches and has no standing in equity for an accounting: Kinter v. Com., 274 Pa. 436; Patton v. Com. Trust Co., 276 Pa. 95; Taylor v. Coggins, 244 Pa. 228; Tozier v. Brown, 202 Pa. 359.

Appellant is barred by adverse possession: Millard v. R. R., 240 Pa. 234.

*Ralph W. Rymer,* for Peoples Coal Co., appellee.

OPINION BY MR. JUSTICE KEPHART, June 23, 1923:

Appellant seeks discovery and accounting for the value of coal mined out of lands, in Scranton, Pa., in which he claims,—as legatee under his father's will and in his own right,—an interest as a tenant in common with defendants. The court below refused relief because of laches and title in one of defendants by adverse possession. As we view the appeal, it is only necessary to consider the first reason to sustain the action of the court below.

The record is voluminous. To obtain a comprehensive view of the case and the attitude of the lower court, it will be necessary to state the relevant facts. As this litigation is solely of interest to the parties, we will endeavor to confine our discussion within narrow limits.

The Bridge Coal Company, a limited copartnership, hereinafter called Bridge Company, prior to December 25, 1888, became the owner of all the coal underneath a fifty-acre tract of land known as "Bridge Lot" (with the exception of the "Big" seam), and of the coal in a number of lots in the Fourteenth Ward, between Ninth and Main streets. These lots were generally contiguous,

with some exceptions, and likewise contiguous to Bridge Lot. Under the Fourteenth Ward there were ten seams of coal. From the top, they were known as the Five Foot, Four Foot, Diamond, Rock, Big, New County, Clark, Dunmore No. 1, Dunmore No. 2, and Dunmore No. 3 veins. The two upper seams going east outcrop before reaching Ninth Street; the eight lower seams are continuous through all parcels of land; there are no breaks or outcrops. Bridge Company did not own, in a few of the ward lots, the coal above the Diamond seam, and in a small half-lot above Big vein; this latter seam under the Bridge Lot was owned by the Delaware, Lackawanna & Western Railroad Company, hereinafter called Lackawanna.

Bridge Company was formed in 1882, for a period of fifteen years; after operating for some years, it found mining unremunerative, and concluded to wind up its affairs. Accordingly a deed was executed and delivered, December 26, 1888, to Judge WILLARD, one of the members, for what is now claimed to be all the coal in and under the Bridge Lot and the Fourteenth Ward lots. The personal property was sold, some of it to partners, the balance to strangers; mine cars were taken from the mines, tracks torn up, plants dismantled, and the company ceased to do business. In the early part of January, 1889, by a settlement paper, the partners disposed of the assets reduced to cash by distributing them among their members, A. B. Stevens, E. N. Willard, Everett Warren, F. E. Stevens, and C. G. Miller. Each member received his proportionate distributive share, and the inference from their acts at this time and thereafter was that the limited copartnership then ceased and determined, there being no creditors outstanding.

While the Act of June 2, 1874, P. L. 271, provides two methods for dissolution of such associations, (a) by expiration of time for which they were to last, and (b) by vote of the majority in number and value of interest, it cannot be denied the conduct of the parties evidenced

that, among themselves, it was understood and considered the partnership was at an end. Technically, publication might have been necessary, but as no person is interested except the parties, the fact remains, the partnership was dissolved as to themselves: Bridge Company, to all intents and purposes, ceased to exist when a distribution of all assets was made. This settlement paper becomes important in a further consideration of the case.

Thereafter no claim was made by anyone for twenty-eight years, or until 1917, for or on account of any matter or thing arising from or through the joint enterprise. On the other hand, many things have been done assertive of absolute ownership, by those claiming to own the property formerly of the Bridge Company, and it is only after the death of every other member of the firm that the smallest shareholder puts forth the claim first mentioned in this opinion.

Appellant now contends the deed to Judge WILLARD conveyed only the coal below the Big vein, with the exception of seven and one-half lots, out of which no coal was conveyed. The reason given for fixing Big vein as the selling line was that the coal from Diamond, Rock and Big veins in the Fourteenth Ward had been first mined, and as to these, and the two top veins, the balance of the coal was not then considered merchantable. Lackawanna, it may be mentioned, also first mined Big seam under Bridge lot.

In this view of the situation, there was no coal of any value above the Big seam; consequently the deed from Bridge Company to Judge WILLARD fixed that seam as the holding line, and did not give title to any coal in or above it. After dissolution, the partners were tenants in common in all the coal in and above the Big vein, as well as the coal in the seven and one-half lots. An examination of the deed shows the construction contended for by appellant to be undoubtedly correct; but it is likewise true that the partners acted on the assumption, and

thereafter conducted themselves on the theory, that Judge WILLARD owned all the coal theretofore owned by Bridge Company. It is quite evident to us the final settlement bore an important part in governing their acts.

Whatever may be the territorial divisions of this land on the surface, as it affects the coal beneath, illuminated by the cross section in evidence, we must treat the eight lower veins, or such as may be embraced in this action, as being one continuous block, regardless of surface divisions.

Judge WILLARD, by lease, which was in fact a sale of coal in place, on June 15, 1889, "conveyed to [Lackawanna] all the merchantable coal in, under and upon [66 acres of land described by metes and bounds], except as hereinafter excepted, together with the sole and exclusive right to mine, remove and dispose of said coal." A royalty of twenty-five cents per ton was fixed, with increases as the price of coal increased, a covenant on part of the lessor to pay taxes, with a limitation clause that the lease did not affect seams where coal had been mined out, and included only coal now owned by the lessor or which he might afterwards acquire.

The lease was evidently thus drawn because of the many small pieces owned by WILLARD. It included not only the coal of the Bridge Company's holdings, but coal in other pieces to which he had no title whatever, being either in the ownership of Lackawanna or of individuals. The limitation clause undoubtedly was meant to affect those pieces of land, and referred to the physical condition of all the property as it then existed. The Big vein under Bridge lot was at all times owned by Lackawanna.

That the intention was to convey by lease all of the coal is further emphasized by admissions of A. B. Stevens, a partner, father of appellant. Through knowledge of Lackawanna's operations, and of the effect of the "settlement" of the Bridge Company's affairs, he recog-

nized the scope and validity of this conveyance, treating it as covering all of the Bridge Company's interests. To use his language, "I do not own a pound of coal in Hyde Park," which embraced the Bridge Company's lands.

This disclaimer was made to Mr. Rymer, an attorney, who particularly interviewed him and Judge WILLARD in 1907 about this coal. Also, when there was a subsidence on this land, precipitating six acres of surface, with forty houses, into a hole, he was solicitous about disclaiming ownership. He stated to a newspaperman, as well as to the engineer for the School Company, that he did not own any of the coal.

Major Warren's family regarded appellant's claim as entirely unfounded; the estate is made a defendant. Mr. Miller, the remaining partner, is dead; his representatives were not made parties to the suit.

So that, whatever the status of the partners might have been in 1888, when the deed to Judge WILLARD was made, the conveyance by him to Lackawanna was a distinct and unequivocal act of ouster, asserting a right of ownership hostile to all others claiming to own an interest, covering all of the coal formerly owned by the Bridge Company. This was followed by almost immediate action from Lackawanna.

Moreover, plaintiff admits he knew of Lackawanna's claims thereunder, and, with such an admission, with all that has been adversely done, what then must become of any right he may have in the instant proceeding?

The court below did not err in finding that A. B. Stevens knew of these conveyances, and the acts thereunder, and acquiesced in them. He assumed the status of having been ousted. The court below might have gone further, and found that his conduct was due to the final settlement between the parties when the company was dissolved, when the partners were in the flesh, as friends.

We do not mean to hold that title to real estate may be lost by admissions, but they bear strongly on a correct interpretation of the settlement paper offered by plain-

tiff, when no doubt all indicia of stock ownership were transferred to Willard, and they aid to a correct understanding of the partners with respect to this coal conveyed from Bridge Company and later to Lackawanna. It must be borne in mind they were dealing in what was a partnership property when plaintiff's brother sold his interest to his father by mere endorsement of the certificate of stock. Plaintiff does not present a single certificate to substantiate his claim, or show any written evidence of outstanding interests. No books, papers nor anything else belonging to the company are produced. He depends on the agreement on file. It is just as reasonable to suppose, from the conduct of Major Warren and Sheriff Stevens, during the many years thereafter, that these certificates were in the possession of Judge WILLARD as his property: Townsend v. Boyd, 217 Pa. 386; Armstrong County v. McElheny, 273 Pa. 208.

But, let us assume plaintiff was a tenant in common with Judge WILLARD and the rest of the concern. The demand here is not for land, but an account for mesne profits. No inflexible rule can be prescribed as to the lapse of what period shall disentitle a suitor to an account. The court may refuse a decree even when an action is not barred by the statute. Judge STORY says: "In matters of account, although not barred by the statute of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy": 1 Story's Eq. Juris., section 529. Lord ELDON, in Foster v. Hodgson, 19 Ves. Jr. 180, 185, 34 Reprint 485, 487, said: "If there has been that delay or forbearance that makes it not illegal but inequitable to demand payment, this court will tell the plaintiff that the law to which he is entitled is not that which is administered here." Each case must be controlled by its own peculiar circumstances, but it may be laid down as a safe general rule that a decree for an account should be denied in every case where it clearly appears the party seeking it has, by his laches, rendered it impossible for

the court to do full justice to both parties, whether the
infirmity of the case consists in the death of a party,
loss of evidence or other cause: 1 C. J. 628, section 84
and note. "A court of equity has always refused its aid
to stale demands, where the party has slept upon his
right, and acquiesced for a great length of time. Noth-
ing can call this court to activity but conscience, good
faith and reasonable diligence; where these are wanting,
the court is passive and does nothing. Laches and neg-
lect are always discountenanced, and therefore, from the
beginning of this jurisdiction, there was always a limi-
tation to suits in this court": Tozier v. Brown, 202 Pa.
359, 364, quoting Smith v. Clay, 3 Bro. C. C. 640. The
question of laches does not depend, as does the statute of
limitations, upon the fact that a certain definite time has
elapsed since the cause of action accrued, but whether,
under the circumstances of the particular case, plaintiff
is chargeable with want of due diligence in failing to in-
stitute or prosecute his proceeding": Kinter v. Common-
wealth Trust Co., 274 Pa. 436, 443, and cases cited.

The lease to Lackawanna was made in 1889; October
26, 1899, it leased to Peoples Coal Company the coal
under the lots in the Fourteenth Ward, to be later desig-
nated, and, at another date, a certain part of the coal
under Bridge lot. Keeping in mind what has been here-
tofore said, the admissions and other matters, we have
here a plaintiff who knows every foot of Bridge Com-
pany's coal holdings. From and before 1882 to 1888 he
made himself familiar with their headings, mine ways,
chambers, side ways and all interior and exterior work-
ing places; in fact, he continued the maps under which
mining was pursued. It is undisputed, for the purpose
of this branch of the case, that mining began in the coal
claimed by plaintiff not later than 1905 and 1906. From
the day of the Bridge Company's dissolution, in 1888,
to 1917, plaintiff has lived or been employed or engaged
in business in close proximity to the surface of this piece
of land. A part of the time from 1892 to 1899 he was

employed in a store that was directly over the Bridge Company's coal, and from 1899 to 1903 his office faced the street which was a boundary of this coal land. During the other years he lived close to it. His knowledge of the surface of this land is undisputed. He therefore was in a position to know, and, from what could be seen on the surface as it related to the inner workings, he was bound to know what was being done with the coal beneath. Fortified with knowledge as a mining man, experienced with these and other mining lands, when these acts on the surface spoke, they should have caused him to find out what was going on below.

On the surface of Bridge lot there are three openings; we need only speak of two of them. The "Cork and Bottle" slope has been used continuously from the period of dissolution to a very recent date, but not for the removal of any coal,—that ceased in 1889. This shaft goes to the Diamond seam, and no farther. That is the first vein on Bridge lot. There is a side slope into the Rock and Big seams; it is a separate slope. Dagger testified the Cork and Bottle slope was used for twenty-one years; miners were constantly coming to the surface from it. Lackawanna was in exclusive possession of it and the shafts. We have evidence of early mining in the seams complained of, and none elsewhere. The conclusion must be these miners, in using the nearest opening to get to the surface, were working in the immediate vicinity, within a few hundred feet of the opening; it is inconceivable, if they were working beyond this land, fifteen hundred feet away, nearer to the Oxford opening, that they would use this exit to the surface. It was the nearest opening while working the Diamond, Rock and Big veins of the old Bridge Company, and, as these two upper veins outcrop at the Lackawanna River, miners could not come from east of this point; they must come from the west. Stevens admitted possession by Lackawanna of these slopes, and he states the slope to Diamond was separate. If appellant's contention is correct, what

right had Lackawanna to use it as a means of ingress
and egress, and for what purpose was it used if not to do
the thing complained of in an open, hostile, notorious
manner,—mine the Diamond, Rock and Big seams? He
never considered anybody but Lackawanna as operating
this land until 1917, and admits the conveyance to Lacka-
wanna was for the purpose of mining out all of the coal.
It is a strong circumstance, sufficient to put on guard one
desirous of protecting his rights. His lack of knowledge
as to merchantable coal will not excuse him: Taylor v.
Coggins, 244 Pa. 228, 231. "Each appellant avers igno-
rance of this first war contract until the summer of 1920,
yet not one avers the making of any effort whatever to
discover it. This, under the circumstances disclosed,
was not the due diligence which the law requires to ex-
cuse laches......'The defense of want of knowledge on
the part of one charged with laches is one easily made,
easy to prove by his own oath, and hard to disprove; and
hence the tendency of courts in recent years has
been to hold the plaintiff to a rigid compliance with the
law which demands, not only that he should have been
ignorant of the fraud, but that he should have used rea-
sonable diligence to have informed himself of the facts.
Knowledge of facts which would put a person of ordinary
prudence and diligence on inquiry is, in the eyes of the
law, equivalent to a knowledge of all the facts which a
reasonably diligent inquiry would disclose': 5 Pomeroy's
Eq. Jur., section 27." Patton v. Commonwealth Trust
Co., 276 Pa. 95, 99, 100.

From one of plaintiff's wide experience, he must have
concluded mining was being done by defendants in veins
it did not own. Particularly is this so as there was no
connection with this slope between the New County,
Clark and three Dunmore veins conveyed to WILLARD,—
these latter were intact and the first two were mined
through an independent shaft. So far as this record is
concerned, we have the same condition with respect to
the unmined coal of the lower eight veins as we had at

the time of dissolution, barring of course the veins above the Big seam. As to these, we have concrete evidence of mining, and it is that coal which is now claimed by appellant. Add to this the fact that Stevens knew of the Lackawanna lease and transfer, and that it had been in the vicinity operating part of the same general tract of land as far back as he could remember as successor to the mining operations of Bridge Company. Neither Stevens nor any of the partners ever visited the Bridge land thereafter.

Again, knowledge is admitted of the mine cave-in of 1909, above described, wherein the schoolhouse on No. 16 was damaged. This embraced a considerable piece of land in Block 21 and adjoining, including much of the surface over Bridge Company's holdings in the Fourteenth Ward. Bridge Company claimed to own all of the seams of coal, with certain minor exceptions, noted above, under the surface of these lots. All the original mining on the Diamond, Rock and Big veins was done prior to the sale to Judge WILLARD; but we have evidence of other mining after that date, and before the subsidence. The physical fact plainly seen on the surface was the mine cave-in. It could come only from a disturbance of property now claimed by plaintiff. There is no other cause to which it was attributable. Suggestion of appellant's counsel that it might be from a thrust, a lateral slide, mining on other lots or other causes, is not supported by the evidence. That excuse cannot prevail as an answer to the question submitted to plaintiff, when he saw the subsidence and other matters mentioned. What should he have done as an owner? He knew either the pillars in the Diamond, Rock or Big veins were being taken out or they were being weakened by mining the bench of the Diamond or the rider of the Rock. The other veins had been intact since the sale to Willard. It was shown in the subsided area that a little more than one-third of the coal left by Bridge Company was in place. Of the six acres that subsided, two acres were in the Big seam.

Something was being done in the area hostile to plaintiff's right, but he took no steps to ascertain what it was. His father, in whose right part of the claim is made, had disclaimed ownership at this time, and before. He visited the engineer of the school district, was shown the report containing the information that the Diamond and Rock veins, with the bottom bench of the former, were being mined to within a close distance of the school property. He had before him the report, and unquestionably knew its contents. Had any interest been claimed in this coal, what more notice should an owner have to start an investigation?

Defendant's engineer also testified to the use of a shaft coming from the Bridge Company's coal. All of the facts enumerated above were not only sufficient to give notice of the particular coal involved, but, as this claim is for all veins in and above the Big seam, with knowledge of the Lackawanna lease and possession, it challenged plaintiff's right to any and all of the coal.

In addition to the reasons set forth by the court below upon the point under consideration, but not here referred to, we are clearly of the opinion,—regardless of the question of adverse possession, and the other questions raised in the case,—that the acts of the appellee were open, plain, decisive, unequivocal and notorious acts of ouster, of such a hostile character as to put a cotenant on inquiry, which, if diligently pursued, would lead to actual knowledge. Declarations of a cotenant with knowledge against interest, are evidence of the existence of such hostile acts: Hover v. Hills, 273 Pa. 580. "Equity will not lend its aid to one who has slept upon his rights until the original transaction is obscured by lapse of years and death of parties": Kinter v. Commonwealth Trust Co., supra, 440, with cases cited. Appellant is guilty of laches.

Decree affirmed, at the cost of appellant.