Smith et al., Appellants, *v.* Kingsley et al.

Argued April 21, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Errors assigned,* among others, were dismissal of exceptions to findings and conclusions of trial judge.

*Thomas Reath,* of *Drinker, Biddle & Reath,* with him *George W. Ellis* and *William A. Skinner,* for appellants.

*M. J. Martin* and *Joseph F. Gunster,* with them *Vandling D. Rose,* for appellees.

OPINION BY MR. JUSTICE MAXEY, June 17, 1938:

This is an action of ejectment by the heirs of a tenant in common and the claim is for a one-quarter undivided interest in the coal underlying a certain area in the Borough of Blakely, Lackawanna County, containing 122 acres. The case was tried by the court below without a jury and the decision was in favor of the defendants. This appeal followed.

Edward London died intestate in 1815, the owner of a tract of land, including the land in controversy, leaving to survive him four children. Two of these children were Isaac London and Susan London Dolph. The present plaintiffs are heirs of the latter. The defendants are the heirs of Jefferson Burr Kenyon, the grantee of Isaac London. The same parties were before us in *Smith et al. v. Kingsley et al.,* 313 Pa. 574, 170 A. 138, on a bill for an accounting, and we affirmed a dismissal of the bill on the ground that plaintiffs were required to establish their title at law before seeking an accounting in equity.

In 1817, Isaac London purchased the share of another child, Elizabeth, in the property in question, and in 1836 he purchased a release of the interest of the heirs of the fourth child, Jonathan.

On October 1, 1828, Isaac London executed a lease to Thomas Meredith for the coal underlying a part of the

Edward London tract. The term of the lease was 100 years. The consideration was $150, plus an annual rental of $1. The lease bears the notation that the $150 was paid and also $5 rental in advance for the first five years of the term. In 1838 the lease of 1828 was modified by subsequent agreements between London and Meredith. By one of these, Meredith's right was expressly limited to the use of the tract as a coal field, with the right to mine and sell coal therefrom. By an agreement dated December 10, 1838, it was agreed that as full consideration for the conveyance, Meredith should take up and cancel an outstanding indebtedness of London's, the annual rental payments then to cease altogether.

On February 14, 1840, Isaac London and his wife executed and delivered to J. Burr Kenyon a deed of conveyance of the entire area now in dispute. This area was admittedly part of Edward London's original warrant which his four children inherited on his death. The deed to Kenyon conveyed Isaac London's entire interest in the property, together with the reversions and remainders thereof, and all his "estate, right, title, interest, use, trust, property, possession, claim and demand whatsoever . . . in law or equity or otherwise howsoever of, in, to or out of the same," specifically excepting and reserving, however, the prior grant of coal rights to Meredith in part of the "tract of land surveyed to Edward London, deceased, the title to which became the property of [Isaac London] by the heirship of Edward London." A covenant of warranty accompanied the habendum clause. This constituted a comprehensive conveyance of Isaac London's entire rights in the property, including any rights that might revert to him or his heirs upon the conclusion of the 1828 lease.

The 1828 lease was referred to and construed in *Kingsley v. Hillside Coal & Iron Co.*, 144 Pa. 613, 23 A. 250, and in *Greek Catholic Congregation of Olyphant Borough v. Wilson Coal Company*, 329 Pa. 341, 198 A.

841. In the former case this court said: "Meredith had the exclusive right to the coal, with a definite term in which to mine and remove it. . . . The writings in this case constituted a sale of the coal to be mined within the term stated therein." In the latter case we said: "The 'severance' which took place when the Meredith lease was executed October 1, 1828, was not a complete severance for all future time. . . . It contemplated only a separation for the space of a century."

Meredith promptly went into possession of the leased premises, actual or constructive, and exercised rights under the lease, although it does not appear clearly that coal was mined in any substantial quantity until about 1860. From 1868 to the present time coal has been continuously mined from the tract. One hundred years having elapsed since the "lease" of 1828 was executed and there still remaining a certain amount of coal in the tract, plaintiffs claim a one-fourth interest in that coal by right of inheritance from their ancestor in title, Susan London Dolph.

Appellees contend that on April 1, 1803, Edward London purchased from William Simrell, a "settlor," a certain tract of land, including the land in question, and that, with his son Isaac, he entered into possession of these premises. In the same year he applied for a Warrant of Survey of this land. Appellees further contend that in the same year Edward London and Isaac London made an amicable partition and division of this tract and marked and defined the boundaries. Isaac London was then of age and married, and appellees state that he entered into and upon the south half of the tract (Edward retaining the northern half) and maintained improvements thereon until the property was sold by him in 1840 to J. Burr Kenyon, excepting the 1828 grant of coal rights to Meredith. Appellees claim that at the time of the death of Edward London in 1815, none of the other heirs at law had any claim of title or possession or right of title or right of possession of any part

of the south half of the tract, which included the lands now in controversy. The court below found "no competent or sufficient evidence of any parol gift of any land from Edward London to Isaac" and "no evidence of any deed or conveyance of any land from Edward to Isaac."

Appellants make no claim to the surface of the land, but claim an undivided one-fourth interest in the coal on the theory that such an interest vested in Susan London on the death of her father in 1815, and that such an interest was never divested. Appellants contend that when Isaac London leased the coal in question to Thomas Meredith, he is *presumed* to have acted for and on behalf of all his cotenants, including Susan.

Since appellees were unable to show Isaac London had a "paper title" to *all* of the land in question, including particularly Susan's quarter interest, inherited on the death of his father in 1815, the question to be decided resolves itself into this: Did the action of the brother, Isaac London, in executing the 1828 lease, constitute such an ouster of his sister, Susan, as would start the running of the Statute of Limitations against her and in favor of the brother, so as to vest in him, at the end of twenty-one years, a title by adverse possession to the interest of the sister?

The burden of proof in this case shifted to the defendants below (the appellees here). The court trying the case as a fact-finding tribunal, found the facts in favor of the defendants. The question for us to decide is whether or not there is in the record sufficient competent evidence to support the court's findings. Under the Act of April 22, 1874, P. L. 109, findings of fact by the trial court when based on sufficient evidence to support a verdict are conclusive on appeal: *Osterling v. Frick*, 284 Pa. 397, 131 A. 250.

Appellants' case rests on the "presumption" invoked by them that when Isaac made the lease to Meredith in

1828 he was acting for all his cotenants, including Susan, and as appellants say, "Neither the making of the lease nor the surrounding circumstances as disclosed by competent evidence are sufficient to rebut the presumption in favor of Susan or to constitute such a decisive, wrongful, hostile act on the part of Isaac as would start the statutory adverse possession period running in his favor."

The presumption that one cotenant holds possession of property for the benefit of all his cotenants has no more force than any other kind of presumption. As we said in *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 173 A. 644: "Presumptions are not evidence and should not be substituted for evidence. No presumption can be evidence; it is a rule about the duty of producing evidence. Presumptions are not fact suppliers; they are guideposts indicating whence proof must come." In the case at bar, after plaintiffs showed "paper title," proof of title *by adverse possession* had to come from the defendants. That it did so come in sufficient probative force to carry conviction to the trier of the facts is evident from the findings and judgment appealed from.

If the judgment of the court below is based on conclusions instead of conjecture, we cannot disturb it. To meet the standards of legal proof, absolute certainty is not required. Wigmore in the second edition of his Evidence, Vol. 1, sec. 27, page 232, says: "The conclusions and tests of every day experience must constantly control the standards of legal logic." In *Neely et al. v. Insurance Co.*, 322 Pa. 417, 422, 185 A. 784, we quoted with approval the following from section 13 of the 15th edition of Greenleaf on Evidence: "In civil cases it is sufficient, if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove. . . . In both cases [civil and criminal] the verdict may well be founded on circumstances alone, and these often lead to a conclusion more satisfactory than direct evidence."

In *Law v. Patterson,* 1 W. & S. 184, 191, this court said: "In order to prove that one tenant-in-common has *claimed the whole exclusively,* it is not requisite that he should be proved to have made an express declaration to that effect; for it may be shown as clearly from his acts as from his words. . . . So a sale of the whole, by one tenant in common of a tract of land, and possession taken by the purchaser and held under it for twenty-one years, amounts to an *actual ouster,* and will bar the other tenant-in-common of his right therein: *Culler v. Motzer* (13 Serg. & Rawle 356). The sale in such case of the whole tract, is in effect such an assertion of claim to the whole as cannot be mistaken, because it is wholly incompatible with an admission that the other tenant-in-common has any right whatever." See also *Dikeman v. Parrish,* 6 Pa. 210; *Wilson v. Collishaw,* 13 Pa. 276; *Miller v. Miller,* 60 Pa. 16. In *Stevens et al. v. D., L. & W. R. R. Co.,* 278 Pa. 284, 291, 122 A. 504, we held that a conveyance of coal mining rights by one member of a defunct partnership was, as to his copartners, "a distinct and unequivocal act of ouster, asserting a right of ownership hostile to all others claiming an interest."

Even in the early case of *Phillips v. Gregg,* 10 Watts 158, cited by appellants, this court approved the following from the charge of the court below: ". . . there might be cases when a jury ought to presume an ouster, as when one tenant takes exclusive possession of the whole property, and the other stands by and sees him do it, makes no demand, especially if he be needy, and no reason can be assigned why, if he had any claim, he should not pursue it immediately."

The case of *Hart v. Gregg,* 10 Watts 185, is also cited by appellants. The vital differences between the facts of that case and this are indicated by the following excerpt from the opinion of this court in that case: "He [the alleged disseisor] never created a new title in himself or any other person under which possession was held. . . . He does not seem even to have claimed it as

17

his own, though even that alone, though accompanied with the receipt of the rents and profits, would not, according to many authorities, be an ouster. On the contrary, he took out a patent in 1813, expressly in trust for himself and the other heirs of his father, and the lands were taxed in the name of the heirs until 1820. So far as we can judge of his intentions by the evidence, there is nothing to justify the belief that he intended to claim or hold against his brother and sister."

In the instant case *(unlike* that of *Hart v. Gregg),* the evidence leaves no room for doubt that Isaac London "intended" by his actions in 1828 and later to show that he regarded himself when he made "the Meredith lease" as the sole owner of the property. The conduct of Isaac London and his sister Susan in respect to the property was consistent with the hypothesis of the defendants that in 1815 Edward London gave this property to Isaac.* The coal in a large area was being "sold" in 1828 for one hundred years. The document was carefully couched in legal phraseology. Evidently at least one party was represented by a lawyer. The fact that the grant contained no indication that any other person than Isaac London had any interest in the property is of great significance. No one seemed to think it necessary or desirable that Susan Dolph join in that grant. Susan did not bestir herself to protect

---

* Certain depositions from old Orphans' Court records in Luzerne County were received in evidence in partition proceedings involving the original "Edward London" tract, in 1836, and these depositions were used in litigation involving this coal land, a half century ago. These depositions by Isaac London and others claiming knowledge of the facts showed that the original Edward London tract of 400 acres was "amicably partitioned" in 1815 and Isaac received the southern half "for having labored for his father for several years after becoming of age." These depositions were received *in this case,* but the court later held them to be incompetent to prove the facts therein contained, having been given in a proceeding to which neither the present plaintiffs nor their ancestors were parties.

any rights she may have had in the coal or in the consideration or in the reservation of fuel coal to the grantor. Her conduct in respect to this property so far as it has been disclosed in this record was that of a person decidedly "not interested."

Appellants in their paper book frankly made the following admission: "In most of the cases on which we rely, one cotenant leased the property, presumably for a short term, and it was held that the making of such a lease did not thereby oust his cotenants from their rights in the property after the termination of the lease. The only difference between the cases cited and the case at bar is the length of the lease in the present case." We think what appellants refer to as "the only difference," to wit: "the length of the lease" in the instant case, is a *vital* difference in the determination of the probative value of the grantor's act in making that lease (which was "a sale of the coal," as appellants stress in another part of their paper book). It may be customary for a cotenant to lease, without the joinder of the other cotenants, a property for *a short term*, but it would be most unusual for a cotenant, without the other cotenants' joinder, to lease a property for 100 years or to sell it outright. Appellants well say: "The present case is unique in its facts because of the unusually long term created by the lease from Isaac to Meredith." It is so unusual for one cotenant to make such a long lease without the other cotenants joining in it, that the court below was fully warranted in inferring from the circumstances here present that Isaac London in 1828 recognized no other person as being his cotenant in the tract in controversy. The inference is equally legitimate that no cotenant would supinely stand by and permit his land to be aliened for 100 years without either her joinder or her protest.

Furthermore, the 1828 "lease" expressly reserved to Isaac London (the sole grantor or lessor named therein) and to his heirs "as long as they shall reside on the

leased premises . . . the right to dig whatever coal they may want for their own use." It is fair to assume that Sarah and her heirs needed coal for their own use just as much as did Isaac and his heirs. But under the lease Sarah and her heirs got nothing. Apparently they demanded nothing. The inference is that legally they were entitled to nothing.

But there is additional evidence which supports the court's findings and conclusions. Ten years later Isaac London and Thomas Meredith met again and entered into a new agreement in respect to the coal tract in question. In this agreement the rights of Isaac in respect to the use and sale of the coal from the tract are substantially enlarged and, what is of even more legal significance, the provisions for annual rental of one dollar and for the payment of "$50 in case the coal on the leased premises shall prove extensive and abundant and of an average thickness of ten feet" was declared "null and void," the consideration for this being that Thomas Meredith "agrees to take up and cancel a certain bond given by the said Isaac to Samuel Dickenson and others, for the purchase money of his farm; the said Thomas also further agrees that the said Isaac may open a mine on the said leased premises at his own expense and cost, and shall be allowed to sell 300 tons of coal to pay the expense thereof but no more." The foregoing was equivalent to a statement that the entire consideration for the modification of the lease of 1828 was for Isaac's sole benefit. Isaac was to have his farm "cleared" of the indebtedness evidenced by a "purchase-money bond" and was allowed to open a mine on the tract leased to Meredith and "to sell 300 tons of coal to pay the expense thereof." Again we find no reference whatever to any cotenant and there is no proof anywhere that any cotenant profited in any way from the 1828 lease or its 1938 modification or made any protest. There is no legal warrant whatever for the presumption or inference that Isaac gave his cotenants anything. The logi-

cal and legal inference is that neither he nor Thomas Meredith recognized the existence of any cotenants, and that no one at the time claimed to be a cotenant.

There is still further evidence to be considered. In 1840, Isaac London executed three deeds conveying parts of the property formerly of the Edward London estate, one to Samuel Callendar, one to Allen Secor and one to J. Burr Kenyon. Each of these deeds described the land conveyed as being a part of the Edward London tract, "the title of which became the property of the first party [Isaac London] by the heirship of Edward London." The deeds to Kenyon and Secor purported to convey portions of the surface overlying the coal leased to Meredith and each deed expressly excepted this coal. These deeds conveyed as appurtenances to the land described all mines, minerals, reversions, remainders, etc., "pertaining to Isaac London and Sally, his wife." To Callendar was conveyed no land underlaid with the coal leased to Meredith. The deed to Kenyon covered the 122 acres of surface overlying the coal whose ownership is now in controversy.

Appellants contend that the above three deeds do not constitute any evidence "showing that the making of the 1828 lease was a hostile, wrongful act by Isaac against Susan." Their argument is that since the coal was "severed from the surface" in 1828 and since the present proceedings relate only to the *coal,* what Isaac London did in respect to the *surface* in 1840 could not affect the rights Susan had in the coal in 1840. This argument apparently overlooks the fact that this case turned on the evidentiary value of acts and circumstances. In the absence of proof of any mutual declarations made by Isaac and his sister Susan in respect to the ownership of property they inherited from their father, who had died intestate in 1815, we are bound to consider how they acted in respect to that property. Defendants pleaded that Isaac acquired all the coal in controversy, together with the overlying surface, in

1815, through an "amicable partition" made by his father. This pleading is unsupported by proof but this does not estop defendants from showing that Isaac *acted* not only in 1828 but afterwards as though he owned the property and that Susan by her nonaction apparently recognized the validity of her brother's claim. Whatever title Isaac had to the surface which he sold to Kenyon in 1840 was, it must be taken for granted, the same title he had to the coal beneath that surface, which coal he leased to Meredith in 1828. The facts that he as *sole* owner conveyed in 1840 the surface of a tract of land which formerly belonged to his father, that his grantees accepted deeds from him as sole owner, and that there is no evidence that Susan made any claim to be a cotenant or to any part of the substantial consideration ($1,250 in the Kenyon deed) "to them [i. e., Isaac London and Sally his wife] in hand paid," are all facts from which the court below had a right to infer that Isaac claimed to be the sole owner of the surface granted in 1840 and from that conclusion the inference is also warranted that in 1828 when he "leased" the coal to Meredith he claimed to be *the sole owner of both the surface and the coal.*

The conduct of Susan London Dolph in respect to the property in question is of great probative value in supporting the findings of the lower court. It is not disputed that she was in the prime of life, being forty-three years of age, when the Meredith lease was executed and fifty-five years of age when the Kenyon deed was executed, and that until her death in 1868 at the age of 83 years she resided within a radius of ten or twelve miles of the land in controversy. Likewise, her husband, whom she married in 1803, spent his entire life until he died in 1860, in the same locality. Long before her death the fact that the property her brother "leased" or sold in 1828 to Meredith contained rich coal deposits became manifest. Yet neither she nor anyone acting in her behalf attempted to assert any rights to that coal

based on the fact that she who is now alleged to have been an owner of an undivided quarter interest in that coal, did not join in the Meredith lease of 1828. Since apparently no document ever existed showing that she authorized her brother to execute the Meredith lease in her behalf as well as his own and since there is no record of her having participated in the proceeds of that lease, the evidence, as already indicated in our discussion of the 1838 modification, being to the contrary, the court below was amply warranted in its finding (51) : "Any presumption that Isaac London's act in leasing the coal to Meredith was in conformity with the rights of his cotenants, not antagonistic thereto; or that he acted for and in their behalf and with their acquiescence and consent and that he accounted to them for the rents and royalties collected, is rebutted by the facts appearing in this record. He did not act for and on behalf of his cotenants."

From the evidence in this case the court below interpreted the act of Isaac London in leasing the coal in question to Thomas Meredith in 1828 as an unmistakable act of ouster of any other parties who may have had any interest therein. There was sufficient evidence in this record to sustain this finding.

We also affirm the following conclusions of law of the court below, inter alia, as follows: "5. The various deeds upon the record from Isaac London, and the lease to Thomas Meredith, with its modifications, were claims of title by Isaac London to the whole of the tract, and as such were notice of adverse and hostile claims to Susan London Dolph, and her heirs, and all persons claiming under her and them, and to the plaintiffs in this case. 6. If Susan London Dolph was ever a cotenant with Isaac London of the tract of land in question, she lost any right she ever had by her inactivity. . . . 7. The plaintiffs have no interest, title, claim or right of possession in the tract of land described in the Writ and they are, therefore, not entitled to recover."

The possession by Thomas Meredith of the coal tract in question was adverse to Susan Dolph, and, as to the reversionary interest in the unmined coal, it was in favor of the grantor, Isaac London. At the termination of the twenty-one-year limitation period after 1828, title to Susan Dolph's interest in this reversion vested in those who took under the 1840 deed of Isaac London to J. Burr Kenyon, his heirs and assigns. Whatever interest Susan Dolph may have had in the property in question was divested by the uninterrupted possession of Kenyon and his successors in title. The claim of the appellants had been barred for more than fourscore years when the instant summons in ejectment was issued.

The judgment is affirmed.